Antone LAWRENCE, Jr., and Mary N. Lawrence, as Co-Administrators of the Estate of Christopher Lawrence, a minor decedent, Plaintiffs,

v.

Eugene P. PETIT, Jr., Individually, and in his capacity as Assistant Director of Transportation (Division of Motor Vehicles of the State of Rhode Island), and Robert J. Connors, Individually, and in his capacity as Chief of Safety Responsibility in said Division of Motor Vehicles, and Richard Roe, (an unknown defendant), Defendants.

Civ. A. No. 79–0409.

United States District Court,
D. Rhode Island.

May 28, 1980.

E. Howland Bowen, Providence, R. I., for plaintiffs.

Stephen F. Mullen, Chief Sp. Counsel, Dept. of Transp., State of R. I., Providence, R. I., and Richard C. Tallo, Johnston, R. I., for defendants.

OPINION

FRANCIS J. BOYLE, District Judge.

This action was commenced by the Plaintiffs pursuant to 42 U.S.C. § 1983 (1974). Plaintiffs are Antone Lawrence, Jr. and Mary N. Lawrence, Co-Administrators of the Estate of Christopher Lawrence and residents of the Town of Little Compton, County of Newport, State of Rhode Island. Defendants are Eugene P. Petit, Jr., individually and in his capacity as Assistant Director of Transportation in the Division of Motor Vehicles of the State of Rhode Island, and Robert J. Connors, individually

and in his capacity as Chief of Safety Responsibility in the Division of Motor Vehicles of the State of Rhode Island. Plaintiffs allege that Defendants' denial of Plaintiffs' request to participate in a third party's financial responsibility hearing concerning an accident involving Plaintiffs' deceased son is a denial of their right to due process of the law guaranteed to them by the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. § 1983. Plaintiffs seek temporary and permanent injunctive relief and compensatory and exemplary damages.

On June 11, 1978, Plaintiffs' minor son and two other persons were killed in an automobile accident, when the car in which they were riding collided with another motor vehicle operated by David Hudson at the intersection of Town Way and West Main Road in Little Compton, Rhode Island. After investigating this accident, the Division of Motor Vehicles [hereinafter Registry] notified Mr. Hudson pursuant to R.I. Gen.Laws §§ 31–31–5 and 31–31–9 that because of his lack of liability insurance coverage at the time of the accident, he would be required to post a financial responsibility bond in the amount of $50,100.00, and that failure to post such bond or request a hearing would result in the suspension of his operator's license and its attendant privileges on February 28, 1979. On February 8, 1979, Mr. Hudson requested a hearing on the ground that there was no reasonable possibility that a judgment for damages would be rendered against him. By letter dated February 15, 1979, Defendant Connors scheduled the matter for hearing on August 16, 1979. The hearing did not occur due to the pendency of this action.

After discovering from the Registry that Mr. Hudson did not carry liability insurance and that a hearing to determine whether a bond was required had been scheduled, Plaintiffs requested that the Registry allow Plaintiffs to be represented at the hearing, to present evidence, and to cross-examine Mr. Hudson's witnesses. Defendant Connors denied Plaintiffs' request by letter dated June 28, 1979, on the ground that the hearing was "only an administrative hear-

ing" and not "a hearing as a court case." Defendant Connors invited Plaintiffs to submit any pertinent information which they wished to be considered and to attend the hearing as observers. Some information was submitted by the Plaintiffs to the Registry in an effort to show that their participation should be allowed. On August 14, 1979, Plaintiffs instituted this action seeking injunctive and declaratory relief against the Defendants allowing Plaintiffs to intervene in Mr. Hudson's hearing. Plaintiffs also seek compensatory and exemplary damages.

The State of Rhode Island does not require the owner or operator of a motor vehicle upon the highways of the State to first obtain liability insurance. In the event of an accident which involves personal injury or property damage of $200 or more, where the owner of the vehicle involved did not have an automobile liability policy or bond in effect, the owner's registration and the operator's license are subject to suspension. Suspension of a license or registration may be avoided if security is furnished to be applied in settlement of damage claims or in satisfaction of any judgment rendered against the person required to make the deposit. Where there are multiple claims, every distribution of funds from security deposits "shall be subject to the limits of the registry's evaluation on behalf of a claimant." R.I.Gen.Laws § 31–31–20(b).

Following an accident, the operator of an involved vehicle is required to file an accident report with the Division of Motor Vehicles within ten days. R.I.Gen.Laws § 31–26–6. Not less than twenty days after receipt of the report of an accident involving an uninsured motorist, the Registry "shall determine the amount of security which shall be sufficient in its judgment to satisfy any judgment or judgments for damages resulting . . . against each driver or owner." R.I.Gen.Laws § 31–31–5(a). This determination does not depend upon a finding of negligence, *Velletri v. Lussier*, 88 R.I. 352, 148 A.2d 360 (1959), and the Registry is required to make this determination upon

the basis of the reports or other information submitted. R.I.Gen.Laws § 31–31–5(b).

The vitality of *Velletri v. Lussier* is a matter of some doubt in light of the opinions of the United States Supreme Court in *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) and *Jennings v. Mahoney*, 404 U.S. 25, 92 S.Ct. 180, 30 L.Ed.2d 146 (1971). Indeed, since *Bell v. Burson*, it has been the practice of the Registry to provide an administrative hearing at which the uninsured motorist is heard on the issue of whether there is a reasonable possibility of a judgment being rendered against him as a result of the accident. In *Bell v. Burson*, it was held that an uninsured motorist had a constitutional right to an inquiry into fault or liability under the due process clause prior to the suspension of his license, that this due process requirement was satisfied by an inquiry to determine whether there is a reasonable possibility of judgments being rendered against the licensee, and that the inquiry need not take the form of a full adjudication of the question of liability. *Jennings v. Mahoney* held that a motorist had been afforded due process where the motorist was provided a judicial hearing at which he was afforded an opportunity to present evidence and cross-examine witnesses. However, the Supreme Court did not determine what essential elements were necessary to such a hearing, and merely stated, in accordance with *Bell v. Burson*, that the hearing to be provided must be "meaningful" and "appropriate to the case." *Jennings v. Mahoney, supra*, at 26, 92 S.Ct. at 181. The Court has not further defined the incidents necessary to procedural due process in these circumstances. Cases involving suspensions for reasons involving the removal of "safety hazards" from the highway are to be distinguished from the nature of this inquiry, which involves only a determination of the amount of security, if any, required to satisfy any judgments against the licensee. *See Dixon v. Love*, 431 U.S. 105, 114–115, 97 S.Ct. 1723, 1728–1729, 52 L.Ed.2d 172 (1976).

The Order to Deposit Surety mailed to the licensee involved in an accident contains a form for the request of a hearing which may be returned to the Registry by the licensee, and which contains a schedule of issues including the allegation that, "I can show clearly that there is no reasonable possibility that a judgment for damages may be rendered against me in any amount as a result of this accident." When an issue is "checked off" by the licensee, a hearing is scheduled prior to requiring surety or license suspension. Thus, it appears that the Registry provides a licensee with a *Bell v. Burson* type of hearing. Although there are no rules or regulations provided for the above procedure, the parties do not press the lack of rules or regulations as an issue in this action.

The issue in this action, however, is whether *Bell v. Burson* should be extended to provide an opportunity to be heard for third parties to a surety hearing. The Plaintiffs allege that although they will be allowed to attend the hearing and to submit information beforehand in the form of affidavits or copies of official records, they will not be permitted to participate either in the form of cross-examination or presentation of witnesses, and they are afforded no assurance the material they submit will be used. Plaintiffs argue that they have a property interest in any surety bond which is required of Mr. Hudson, because any judgments which they would obtain on either their claim for property damage to their automobile or on their claim for damages for the death of their son as Co-Administrators of his estate could be satisfied from this surety. This is a property interest, Plaintiffs argue, which would be denied without due process of the law unless they are allowed full participation in the licensee's hearing to determine whether there is any reasonable possibility of judgment being rendered against him. Defendants argue that the hearing is administrative in nature and is not a judicial proceeding, and that Plaintiffs' interest in the security is not a property right for the purposes of the due process clause of the Fourteenth Amendment.

■ At the outset, it should be noted that Plaintiffs have some interest in the

outcome of the security hearing and the allocation of any required security. The Rhode Island Supreme Court has held that the Financial Responsibility Act is constitutional under the due process clause as a valid exercise of the police power of the state to "protect the public using the highways from financial hardship resulting from the operation of motor vehicles by persons financially irresponsible . . ." *Berbarian v. Lussier*, 87 R.I. 226, 232, 139 A.2d 869, 872–73 (1958). Thus, Plaintiffs are within a class intended to be benefited by the Act.

The security required for a single accident may not exceed $50,000 for personal injuries and $10,000 for property damage. In this matter, it appears that there are three separate claims for the wrongful death of three young men. Because the Rhode Island wrongful death statute seeks to compensate the survivors for the loss to the estate of the decedent, it is obvious that if there is fault on the part of the licensee, the total claims will more than likely exceed the maximum allowable security of $50,000. *See* R.I.Gen.Laws § 10–7–1, *et seq.; Williams v. United States*, 435 F.2d 804 (1st Cir. 1970). Under these circumstances, each claimant then has at least some interest in the deliberations of the Registry concerning whether and to what extent security should be required.

Also, Plaintiffs have some interest in the allocation of any security ordered. One of the decedents was the operator of one of the vehicles involved, while the other two decedents were passengers. Therefore, the claims of the two deceased passengers might stand on different footing. In the determination of the amount of security required, the Registry has the responsibility to allocate the amount of security required among the several claimants. This allocation is of interest to each of the decedents' representatives. The precise issues before this Court are whether the interests in the security before and after its posting are sufficient to be considered interests protected by the due process clause, and if so, the extent of the protection afforded by the due process clause.

The considerations which effect a determination of the extent of recognition and requirements of due process are spelled out in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In *Mathews v. Eldridge*, the Supreme Court stated at pages 334 and 335, 96 S.Ct. at page 903:

> More precisely, our decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

With this tripartite test in mind, we shall turn to a consideration of the issues presented by this action.

## THE PRIVATE INTEREST AFFECTED

The private interest affected is the possibility of additional security to protect a citizen from loss arising out of the use of the highways by creating a fund from which, if provided, injured parties may satisfy judgments against uninsured motorists. The general public interest, however, is the suspension of licenses of uninsured motorists who do not post security after involvement in an accident. In this instance, Plaintiffs are included in a class of persons which the legislation is intended to benefit, and indeed, as previously indicated, that benefit is the basis for the exercise of the police power. The Plaintiffs' situation is precisely the type of situation which the legislature intended to relieve. Plaintiffs have invoked their right under the state law to bring a wrongful death action in the Superior Court of the State of Rhode Island seeking a determination of the licensee's liability and damages. In that action, they have no right to any security for the satisfaction of any damages they might be

awarded, except such state process as may be available to enforce a judgment. Thus, the Financial Responsibility Act may possibly provide a fund from which Plaintiffs' claim may be satisfied.

However, an Order of the Registry requiring that the licensee furnish security does not guarantee to Plaintiffs that security will indeed be furnished. The licensee has the option to either furnish security or forego his license. The governmental benefit conferred by the statute is, therefore, a limited and qualified requirement for security. It is not a continuing benefit such as welfare payments or disability insurance. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Mathews v. Eldridge, supra*. Neither is the benefit the same type of interest as a drivers license or an interest in continued employment. *See Bell v. Burson, supra; Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). At best, Plaintiffs have the entitlement to a requirement that the licensee either furnish security or forego his license.

The range of interests protected by procedural due process is not infinite. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Burns v. Sullivan*, 619 F.2d 99 (1st Cir. 1980). In *Board of Regents v. Roth*, the Supreme Court stated, 408 U.S. at page 577, 92 S.Ct. at page 2709:

> To have [the] property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

In *Burns v. Sullivan*, the Court of Appeals for the First Circuit held that a police officer had only an expectation and not a property interest in promotion to the rank of sergeant where his name had been placed on the eligibility list for promotions, but other subjective factors were taken into account in determining promotions. In that case, the court stated:

> Thus, while Burns may have had certain expectations as a result of his rank on the eligibility list any such expectations were substantially diminished by the ability under state law . . . to consider subjective factors in addition to the written examination score. In light of the qualified nature of these expectations, we find that Burns' interest in becoming a sergeant did not rise to the level of a property interest entitled to constitutional protection.

*Burns v. Sullivan, supra*, at 104. Although the facts of that case are not identical to those of the instant case, the teaching is clear from *Burns v. Sullivan* that there are limits to the interests protected by procedural due process.

Although, in this instance, the relief ultimately sought is the reimbursement to the decedent's estate for the loss sustained due to alleged wrongful death, the statutory security may be required in other instances to reimburse a wide range of types of damages, including of course, lost wages and property damage. However, before an injured party obtains security, the licensee must furnish it. A licensee may refuse or fail to file security, and forego his license. The Plaintiffs argue, citing *T. A. Moynahan Properties, Inc. v. Lancaster Village Cooperative, Inc.*, 496 F.2d 1114 (7th Cir. 1973), that this possible defeasance is of no consequence. In that case, however, the Plaintiff's property management agreement was subject to cancellation by the government, a third party wholly outside the control of

the adversaries concerned. In the present case, the frustration of the Plaintiffs' expectation may be accomplished not only by the action of the licensee in refusing to furnish security, but also by the licensee lacking means to furnish security.

The inability or deliberate failure of the licensee to furnish security is not a remote possibility considering first that one is probably an uninsured motorist due to the lack of means to obtain insurance. No doubt there are instances where there is a lack of insurance protection due to oversight, error, or independent financial means, but in the overwhelming majority of instances it is likely that the person ordered to furnish security is not financially able to do so. In this matter, there are three claims for wrongful death, and the amount of security ordered for personal injury is the $50,000 maximum. It is highly unlikely that there are many instances of an uninsured motorist capable of furnishing $50,000 security. Also, the record in this case demonstrates that the licensee does not presently have a valid license for other reasons. Thus, the statutory incentive of providing the ordered security to retain one's license is ineffective, and it is unlikely that the licensee would provide the security in such circumstances. These factors demonstrate the fragile nature of the Plaintiffs' expectations due to the strong probability that security will not be furnished.

Lastly, it cannot be said that the sole purpose of the legislation is to benefit persons in the Plaintiffs' situation. An obvious ancillary effect of the statute is to suspend the operating rights of a financially irresponsible operator for the protection of those who might be injured in the future. This purpose is evidenced by the statute's correlative requirement that the right to operate a motor vehicle, once suspended, will not be reinstated unless the operator provides proof of future financial responsibility. R.I.Gen.Laws §§ 31–32–4 B and 31–32–5.

Therefore, if Plaintiffs' interest in security not yet provided can be considered an entitlement which should be accorded due process protection, the limited nature and quality of this interest and its tenuous existence suggest limited protection. Indeed, the ephemeral nature of the interest is such that it barely escapes classification as a unilateral expectation.

Plaintiffs' interest in security not yet provided, however, should be contrasted with the Plaintiffs' interest in security which a licensee chooses to provide. If security is provided by the licensee, the Registry must satisfy any judgment obtained against the licensee by Plaintiffs with this fund. R.I. Gen.Laws § 31–31–20. Therefore, the Plaintiffs have some entitlement to security which is in fact provided.

RISK OF ERRONEOUS DEPRIVATION

Although there are no written rules or regulations, the Registry, after issuance of an order to furnish security or have one's license suspended, stays its order upon the filing by the operator of a request for a hearing to show cause why security should not be furnished. At the hearing, the operator is permitted to show the lack of a reasonable possibility of a judgment being rendered against him. The proof in this action demonstrates that the Registry is limited in the matters it considers during the preliminary determination of whether a security order should issue. The only evidence considered was the accident report furnished by the licensee and the police report. Plaintiffs have established that there is substantial evidence which is not before the Registry and which might implicate the licensee at the hearing. This evidence includes incriminating photographs and additional police reports. The Registry will permit the Plaintiffs and their counsel to attend the show cause hearing, but will not permit them to participate. Evidence or other information may be furnished to the Registry, but there is no assurance that such evidence or other information will actually be considered. Additionally, the determination of the issues presented at a show cause hearing is made by three employees of the Registry, one of whom hears the testimony and argument and reports it to the others with a recommendation.

These factors show that there is at least some risk of an erroneous determination by the Registry.

On the other hand, the Registry has been given wide discretion by the General Assembly in dealing with security for uninsured motorists, and it must be assumed that the Registry has expertise in this area. The area of inquiry at these hearings is a narrow one, and concerns only whether there is a possibility of judgments being rendered against the uninsured motorist. The basic information which is needed for such a determination is already before the Registry in the form of required accident reports on behalf of all parties involved and police reports. The Registry holds 11,000 show cause hearings per year.

Under all the circumstances, however, and keeping in mind that these procedures are not embodied in any formal rules or regulations, there is at least some risk of an erroneous determination at a show cause hearing, and the addition of further procedural safeguards would be of some value.

Once security has been provided, the Registry may make distributions from the fund to satisfy any settlements or judgments obtained against the licensee. R.I.Gen. Laws §§ 31–31–20(a)(1) and (2). Any distribution to a claimant "shall be subject to the limits of the registry's evaluation on behalf of a claimant." R.I.Gen.Laws § 31–31–20(b). Thus, the Registry has plenary discretion with respect to the allocation and distribution of the security among the claimants who have a statutory interest in the provided security. Again it must be assumed the Registry has some expertise in this area. However, because there are no rules or regulations which govern the security's distribution, and because claimants are not provided with any hearing to determine the extent of their interests in the provided security, there is a risk of erroneous determination, and procedural safeguards would be of distinct value.

### THE GOVERNMENT'S INTEREST

The Financial Responsibility Act covers the accidents of all uninsured motorists from the fender-bender type of collision, with some minor exceptions, to the type of serious injuries involved in this action. Defendants point out that there are 30,000 accidents a year involving uninsured motorists, and 11,000 show cause hearings per year are conducted by the Registry. In this action, an adversarial hearing would involve not only the operator and the Registry, but would require the participation of four other parties, namely, the representatives of the three decedents and the owner of the other motor vehicle. It is obvious that if a full adversarial hearing were provided in all uninsured motorist cases, the burden of the Registry would increase dramatically. Under these circumstances, it is significant that the prerevocation hearing required by *Bell v. Burson* involves only a determination of reasonable possibility and "need not take the form of a full adjudication of the question of liability." *Bell v. Burson, supra,* 402 U.S. at 540, 91 S.Ct. at 1590.

In *Bell v. Burson,* the court stated, "While the problem of additional expense must be kept in mind, it does not justify denying a hearing meeting the ordinary standards of due process." *Id.* at 540–541, 91 S.Ct. at 1590. In *Mathews v. Eldridge,* however, the court stated, "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Mathews v. Eldridge, supra,* 424 U.S. at 348, 96 S.Ct. at 909. The court further observed:

> All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' *Goldberg v. Kelly,* 397 U.S. [254] at 268–269, [90 S.Ct. 1011, at 1020–1021,] 25 L.Ed.2d 287 (footnote omitted), to insure that they are given a meaningful opportunity to present their case.

*Mathews v. Eldridge, supra,* at 349, 96 S.Ct. at 909. Additionally, the confidence of the General Assembly in the fairness of the administration of these provisions, which is evidenced by the broad discretion afforded to the Registry in making decisions, is a

relevant factor to be weighed in the determination of the requirements of a due process hearing.

It is clear that the imposition of a full judicial type of hearing on the questioned administrative procedure would place heavy financial costs and administrative burdens upon the Registry.

In sum, considering the tenuous nature of Plaintiffs' expectancy under the statute, the fact that there is some possibility of an erroneous determination, and the serious burden which would be imposed upon the Registry should the full panoply of judicial due process be imposed upon the administrative process, it is obvious that something less than a full judicial due process is demanded of the administrative process, and, it is obvious that something less than a full judicial type of hearing will satisfy the need to protect the limited entitlement of the Plaintiffs in a determination of whether security should be required.

■ Due process does not require, in all circumstances, a full judicial type hearing. " 'The formality and procedural requisites for [a due process] hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.' " *Arnett v. Kennedy, supra*, 416 U.S. at 164, 94 S.Ct. at 1649 (concurring opinion), *quoting Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). In *Arnett v. Kennedy*, the Supreme Court held that a federal employee, who was given thirty days notice of his termination, was not entitled to a pretermination evidentiary hearing, and that the requirements of due process were met where the employee had the pretermination right to respond orally or in writing, including the submission of affidavits, to the official having the authority to recommend or make the termination decision. In *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Court held that although due process required a juvenile be convicted of a crime only after proof beyond a reasonable doubt, due process did not require that the juvenile delinquency hearing conform to all the procedural re-

quirements of a criminal trial. Lastly, in *Gabrilowitz v. Newman*, 582 F.2d 100 (1st Cir. 1978), the court held that a student would be deprived of due process unless he would be allowed to have his counsel present at a college disciplinary hearing. The court, however, only required the presence of the attorney, and did not require that the attorney be allowed to participate in the proceedings in the form of presentation and cross-examination of witnesses. As these cases indicate, something less than a full judicial type of hearing will provide due process to an interested party under certain circumstances. *See also, Board of Regents v. Tomania*, —— U.S. ——, ——, 100 S.Ct. 1790, 1797, 64 L.Ed.2d 440 (1980) (concurring and dissenting opinions); *Missouri ex rel. Hurwitz v. North*, 271 U.S. 40, 46 S.Ct. 384, 70 L.Ed. 818 (1926).

In addition to the issue of what protection is to be afforded with respect to a determination of whether any security is to be required, there is the issue of once security is required and furnished, what protection should be afforded concerning the allocation of the security among several claimants. The Registry seems to have unbridled discretion under the statute with respect to the latter determination. *See* R.I. Gen.Laws § 31–31–20(b).

■ With all of these considerations in mind, the Court concludes that the Plaintiffs do have a constitutionally protected entitlement in both issues, *i. e.* whether security is to be required and how it is to be allocated. With respect to whether security is to be required, the Plaintiffs' constitutional interest is minimal, and therefore, minimal requirements will suffice. These requirements must include a right to notice of the Registry's proceedings and hearing, a right to notice of the terms of the initial show cause order, a right to submit written information in the form of affidavits and real evidence, and an opportunity to attend the show cause hearing. These requirements need not include the right of the third parties, such as Plaintiffs in this action, to participate in the show cause hearing, but must include the right of the in-

jured third parties to be given notice of the final action taken by the Registry. Any affidavits or real evidence submitted to the Registry must be made a part of the record and considered by the Registry in arriving at its decision. The issue of whether the injured parties should have the right to a judicial review of the Registry's action is not before this Court, and is a matter in the first instance of statutory construction best left to a determination of a State Court.

With respect to the allocation of any required security, if provided, the Registry has almost plenary discretion. Once security is provided, the Plaintiffs' constitutional interest is greater, and they must be afforded greater procedural safeguards. The injured parties should be given notice of the allocation of any security by the Registry and a hearing upon the correctness of the allocation before any funds are distributed. Although these requirements will add somewhat to the present practice, they should not present an overwhelming burden upon the Registry either in terms of time or money.

Plaintiffs' prayer for compensatory and exemplary damages is denied. Plaintiffs may prepare and present a form of Judgment, with costs to Plaintiffs.

SO ORDERED.